**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Stanton G. POLIN and Florence Phillips, Defendants–Appellants.**

No. 98–4264.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 14, 1999.

Decided Oct. 20, 1999.

864

Stuart Fullerton (argued), Office of the United States Attorney, Civil Division, Appellate Section, Chicago, IL, for Plaintiff-Appellee.

Leigh D. Roadman (argued), Martin, Brown & Sullivan, Chicago, IL, for Defendants-Appellants.

Before BAUER, ROVNER and EVANS, Circuit Judges.

BAUER, Circuit Judge.

On May 19, 1998, a grand jury in the Northern District of Illinois returned a seven-count indictment against appellants Stanton G. Polin and Florence Phillips ("Polin" and "Phillips"), charging them with conspiring to pay, and paying, kickbacks for the referral of Medicare patients to the Center for Vascular Studies ("CVS")

in violation of 18 U.S.C. § 371 and 42 U.S.C. § 1329a–7b. CVS is a medical facility that provides cardiac pacemaker monitoring services to Medicare beneficiaries. Polin was a medical doctor and CVS's director. Phillips was a registered nurse at the center and administrative assistant to Polin. The defendants were tried before the district court on September 15 and 16, 1998. At the close of the government's case, the defendants moved for acquittal, arguing that the government had charged Polin and Phillips under the wrong section of the statute and had failed to prove the crimes actually alleged in the indictment. The district court denied the defendants' motion and returned judgments of guilty on all seven counts. Polin and Phillips appeal from the district court's denial of their motions. We affirm.

## I. BACKGROUND

A cardiac pacemaker is an electronic device used to regulate the heart. Once implanted into the patient's chest or abdomen, it is used to govern the heartbeat. Because of its critical function, the pacemaker must be regularly monitored to ensure its continuing good function. The monitoring can be done either in person or over the telephone and is performed by either the implanting physician or an outside monitoring service such as CVS. In about thirty percent of the cases, the physician monitors his own patients. The remainder are referred to outside services.

In May, 1992, Phillips contacted Matthew Haberkorn ("Haberkorn"), a pacemaker sales representative,[1] and offered him fifty dollars cash for each Medicare patient he referred to CVS for monitoring services. From Polin's and Phillips' perspective, Haberkorn was an ideally situated target and potential partner in their referral for cash scheme. Haberkorn's job as a sales representative included selling

1. During 1992 through 1994, Haberkorn was an independent cardiac pacemaker sales representative. From 1993 through 1994, he also acted as a sub-representative for James Kalins, an independent sales representative who marketed cardiac pacemakers through his own company, Illinois Pacing Systems, Ltd.

pacemakers to hospitals and physicians, attending implant procedures and making sure that patients were properly monitored after the pacemaker was implanted.

Haberkorn testified at trial that the latter responsibility often required him to refer patients to outside services such as CVS for follow-up. If the physician decided to use an outside service, Haberkorn would contact such a service, give them the patient's data and make sure the patient was set up for the proper monitoring. Although he admitted that the physician had the right to refuse any service he chose, Haberkorn stated that he had never been overruled by a physician during his fourteen year career.

As incentive to Haberkorn to send patients their way, Phillips proposed a classic kickback scheme: for each patient Haberkorn "referred," Polin and Phillips would pay him fifty dollars, in cash. Haberkorn would not, however, receive payment if the patient said no, if the physician said no, if the patient died before monitoring services began, or if the patient was in a nursing home with which CVS already had a monitoring contract.

Thinking that Phillips' offer of cash payments was "wrong," Haberkorn contacted the HHS Office of the Inspector General and worked with a special agent to formulate a plan to expose Polin and Phillips. Between November, 1992 and June, 1994, Haberkorn made more than three dozen recordings of his meetings with both Polin and Phillips, including the occasions where they gave him the money. Haberkorn and the special agent also enlisted the help of Dr. Honeid Baxamusa, an internal medicine specialist. Dr. Baxamusa agreed to give Haberkorn four additional patients to refer to CVS.

Polin and Phillips paid Haberkorn fifty dollars for each of these four patients as well as fifty dollars each for two other patients Haberkorn had received and referred from another physician.[2]

The government's evidence was primarily the testimony of Haberkorn and the tape recordings. At the close of the government's case, and in the face of overwhelming evidence, the defendants moved for the entry of a Judgment of Acquittal. They argued that they had been incorrectly charged under 42 U.S.C. § 1329a–7b(b)(2)(A) (the "refer prong") and that the evidence showed only that they violated 42 U.S.C. § 1329a7b(b)(2)(B) (the "recommend prong"). They asserted that it was the patient's physician who actually "referred" the patient. Haberkorn's role had merely been to "recommend." Therefore, they continued, having been charged only with contravening the refer prong and the evidence proving only a violation of the recommend prong, they were entitled to a judgment in their favor. The district court disagreed and denied the motions.

Polin and Phillips were found guilty by the district court of all seven counts of conspiring to, and paying, kickbacks in violation of the Medicare Anti–Kickback Act. Each was sentenced to three years probation, three hundred hours of community service and a fine of ten thousand dollars.

## II. DISCUSSION

On appeal, Polin and Phillips assert that the district court erred in denying their Rule 29 motions. They argue that "because the cardiac pacemaker patients at issue were referred by their respective physicians, not by Haberkorn or Kalins" they did not violate 42 U.S.C. § 1320a7b(b)(2)(A) as charged. They concede that they may have violated section B of the Act because they paid Haberkorn and Kalins to "recommend" to physicians that Medicare patients be sent to CVS, but they declare that behavior is of no consequence and does not prove the charges against them. We disagree.

The district court's ruling on the motion for entry of judgment of acquittal

---

2. Additionally, Polin and Phillips were making similar payments to James Kalins.

is reviewed *de novo*. *United States v. Draves*, 103 F.3d 1328 (7th Cir.), *cert. denied* 521 U.S. 1127, 117 S.Ct. 2528, 138 L.Ed.2d 1028 (1997). We review the entire record, but any inferences drawn therefrom are taken in the light most favorable to the government and we will reverse only if there is no evidence from which the trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Id.* (citation omitted).

■ 42 U.S.C. § 1320a–7b(b)(2) provides:

(2) whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person—

(A) to refer an individual to a person for the furnishing or arranging for the furnishing or any item or service for which payment may be made in whole or in part under a Federal health care program, or

(B) to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program,

Shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.

The indictments against Polin and Phillips charged them with violating 42 U.S.C. § 1320a7b(b)(2) but did not specify any subpart. The charging language, however, paralleled that of subsection A (the "refer prong") as did the evidence at trial which focused on the "referral" by Haberkorn and Kalins of patients to CVS.

The use of the word "refer" in subsection A versus the word "recommend" in subsection B is the distinction upon which appellants hang their hat. They alternatively debate whether the words have blended or separate and distinct meanings and whether the actions of Haberkorn were referrals or recommendations. In other words, they cling to the splitting of hairs to avoid their convictions. We do not accept their exercise and believe that to do so would obfuscate the purpose and the meaning of the Act.

We do not believe, as appellants suggest, that 42 U.S.C. § 1320a–7b(b)(2)(A) and (B) are two separate subsections that address "different and non-overlapping" types of conduct. Counsel for the government aptly summarized the similarities in this situation when he said, "Refer is to recommend, is to turn over, is to make a selection, is to give the business away; and that's what Mac [sic] Haberkorn was in the position to do."

The evidence bears this out. Once it was decided that the patient would be sent to an outside service for monitoring, Haberkorn would suggest CVS or a similar service to the physician. Never in his fourteen year career was Haberkorn's suggestion rebuked by a physician. Indeed, after his recommendation was made, he would call CVS and arrange for the patient's follow-up himself. Of course, CVS would have to receive the physician's authorization before commencing service, but that permission seemed to be more of a formality or rubber stamping of Haberkorn's referral.

Appellants rationalize that because the physician's approval was needed before they could begin monitoring, only the physician is capable of making a referral. Haberkorn's permission was not needed, thus his services were merely a "recommendation." To adopt this view would lead to absurd results. Only a physician could violate Subsection A as only he can "refer" a patient. Only a lay-person could violate Subsection B since he can only "recommend" a particular service. This is clearly a perversion of the Act and we decline to read it that way.

■ Furthermore, we believe that appellants have misread the Act. The differ-

ent subsections do not distinguish between physicians and lay-persons. The subsections refer to the difference between referral of individuals (Subsection A) and the recommendation of specific services (Subsection B). We find support for our position in the Ninth Circuit. *United States v. Stewart Clinical Laboratory*, 652 F.2d 804 (9th Cir.1981). Construing identical language in 42 U.S.C. § 1396h(b) which prohibits the payment of kickbacks and bribes in connection with Medicaid programs, the court explained that "Subsection (A) prohibits payoffs for referring Medi–Cal patients. Subsection (B) prohibits payoffs for referring Medi–Cal services, including laboratory work." *Id.* at 807. Although the court in that case found that the defendant was convicted of an offense different than that for which he was indicted, we believe that important factual differences mandate a different result here.

### III. CONCLUSION

This is a classic case of an illegal kickback prohibited by 42 U.S.C. § 1320a–7b(b)(2)(A). In exchange for directing Medicare patients to CVS, Polin and Phillips were willing, and did, pay Haberkorn and Kalins money. It is difficult to imagine a case which more squarely falls within the meaning and plain language of the Act. For these reasons, we believe the district court correctly denied the Rule 29 motions.

AFFIRMED.