BARRON, Circuit Judge, concurring in part and dissenting in part.
To plead a viable retaliation claim under the False Claims Act ("FCA"), 31 U.S.C. § 3730(h)(1), a plaintiff must allege that the conduct that he reported to his employer and that resulted in his termination was "calculated, or reasonably could lead, to a viable FCA action." United States ex rel. Karvelas v. Melrose-Wakefield Hosp., 360 F.3d 220, 236 (1st Cir. 2004) (internal quotation marks omitted). Thus, when an FCA retaliation claim relies on a report of a violation of the Anti-Kickback Statute ("AKS"), 42 U.S.C. § 1320a-7b(g), as is the case here, the plaintiff needs to allege facts that would suffice to show that the conduct that he reported to his employer is of a kind that is actionable under the AKS. See Karvelas, 360 F.3d at 237 (holding that "protected" activities must "concern the employer's knowing submission of false or fraudulent claims for payment to the government" (emphasis added) ).
To be clear, the plaintiff in such a case need not prove at the pleading stage that what he complained to his employer about was an actual AKS violation. But, the plaintiff must sufficiently allege that "his reports concerned FCA-violating activity such as the submission of false claims" resulting from conduct that could constitute a violation of the AKS. United States ex rel. Booker v. Pfizer, Inc., 847 F.3d 52, 60 (1st Cir. 2017). And, for that reason, the allegation in Thomas Guilfoile's complaint in this case that "he reasonably believed" that the conduct that he was reporting to his employer prior to his termination revealed a "violation[ ] of the AKS ... resulting in the *196 submission of fraudulent claims to the government" is not itself of any significance. Guilfoile must do more than assert a "legal conclusion couched as a factual allegation" to satisfy his burden at the pleading stage. Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) ); see also Karvelas, 360 F.3d at 224 (setting aside "bald assertions" or "unsupportable conclusions" in an FCA complaint). The crucial question that we must resolve, therefore, is whether, taking as true the complaint's factual allegations about the conduct that Guilfoile reported to his employer, Guilfoile has satisfied his burden to show that the conduct that he allegedly reported is at least of a kind that falls within the scope of the AKS. For, if that conduct alleged is not even of that kind, then I do not see how his FCA retaliation claim -- insofar as it is premised on the report of an AKS violation -- may survive a motion to dismiss.
I.
Guilfoile alleges in his complaint that his employer -- several general pharmacy services providers operating as a single integrated entity (the "Integrated Entity") -- was bidding for hospital contracts with the assistance of a financial consultant, Michael Greene, who was simultaneously serving as a financial advisor to those hospitals. I agree with the majority that Guilfoile sufficiently alleges in his complaint that he was fired by his employer after reporting that it was making payments to the consultant in order to induce him to use his position at the hospitals to steer the hospital contracts the Integrated Entity's way. See Maj. Op. 191-92. I also agree that these allegations of employer-induced double-dealing are concerning.
Nevertheless, the District Court found those factual allegations -- even if taken as true -- to be legally wanting. The District Court did so because it interpreted the AKS to prohibit only payments made to induce "other providers or individuals [to] directly refer[ ] or recommend[ ] patients to specific services" to be paid for with federal health care funds. The District Court then concluded that Guilfoile has not alleged facts sufficient to show that Greene "could or did play a role in referring or recommending federal program patients to Defendants through his financial consultant work with Defendants."
In reaching that conclusion, the District Court rejected Guilfoile's argument that Greene's facilitation of general contracts between the Integrated Entity and the hospitals for general pharmacy services that created the opportunity for "general access to patients amounts to a referral or recommendation" within the meaning of the AKS. The District Court appears to have relied for that determination on the attenuated relationship between two things: (1) the general contracts for pharmacy services that Greene allegedly arranged between the Integrated Entity and the hospitals; and (2) the particular purchases by particular buyers of drugs from the pharmacies set up by the Integrated Entity in the hospitals.
I see how the text of the AKS lends support to the District Court's logic. As relevant here, the AKS prohibits payments "to induce" the recipient of the payments "to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program[.]" 42 U.S.C. § 1320a-7b(b)(2)(B). The only transactions that Guilfoile has alleged that the Integrated Entity paid Greene to induce him to "arrange for or *197 recommend" directly, however, are the "purchas[es]" or "order[s]" by the hospitals of the specialty pharmacy services provided by the Integrated Entity via the contracts allegedly facilitated by Greene's paid work for Integrated Entity. But, "payment ... under a Federal health care program" is not made for those general services. Rather, payment is only made from a federal health care program in consequence of the particular purchases by particular buyers of drugs from the pharmacies set up by the Integrated Entity in the hospitals.
There is, then, necessarily a fair amount of attenuation between the actual transactions that Greene was allegedly induced to "arrange for" (the hospitals' "purchas[es]" or "order[s]" of the Integrated Entity's general pharmacy services) and the transactions "for which payment may be made ... under a Federal health care program" (some unknown purchases from an Integrated Entity-run pharmacy of some unknown drugs by some unknown patients who happened to be eligible for reimbursement under a federal health care program). Moreover, that degree of attenuation appears to inhere in the conduct that Guilfoile's complaint alleges took place, given the middleman nature of the general pharmacy services that the Integrated Entity retained Greene to assist it in offering to the hospitals. Thus, nothing about Guilfoile's allegations concerning his report of that conduct to his employer indicates that the progression of the case will reveal the attenuation that concerned the District Court to be any less substantial than it now appears to be.
II.
The majority rejects the District Court's reasoning regarding the attenuation problem. The majority concludes that United States v. Bay State Ambulance & Hosp. Rental Serv., Inc., 874 F.2d 20 (1st Cir. 1989), compels us to construe the AKS to encompass situations with this degree of attenuation between general services contracts and any federal payment from a federal health care program that would result from particular purchases by particular patients availing themselves of those services. See Maj. Op. 192-93. It is true that Bay State did uphold the AKS conviction of an ambulance services company and its president for paying kickbacks to a hospital employee. Bay State did so, moreover, even though that employee "arrange[d] for" only a general ambulance services contract between the hospital and the ambulance services provider, and not any particular purchase of ambulance services by a patient for which the federal government would make a payment. See id. at 192-93, 196.
In my view, however, Bay State is not so clearly controlling a precedent on the attenuation issue as the majority concludes that it is. That is so for three reasons.
First, the attenuation issue was not raised in Bay State. And thus, Bay State did not need to address -- and did not in fact address -- whether what the kickback recipient "arrange[d] for or recommend[ed]" fell within the scope of the AKS or was instead too attenuated from any payment from a federal healthcare program to do so because the parties made no such argument. See Gately v. Com. of Mass., 2 F.3d 1221, 1226 (1st Cir. 1993) (describing the "essential principles of stare decisis" to include "(1) an issue of law must have been heard and decided" and "(2) if an issue is not argued, or though argued is ignored by the court, or is reserved, the decision does not constitute a precedent to be followed"); United States v. DiPina, 178 F.3d 68, 73 (1st Cir. 1999) ("Where, in a prior decision, we have not considered an issue directly and assessed *198 the arguments of parties with an interest in its resolution, that decision does not bind us in a subsequent case where the issue is adequately presented and squarely before us, merely because some of the background facts are the same.").
Second, Bay State is in some respects an easier case in which to find the nexus that the text of the AKS demands between the payment from a federal health care program and the transaction that the payment recipient "arrange[d] for" than this one is. The ambulance services eventually purchased by patients in Bay State were clearly reimbursable under a federal health care program. By contrast, it is less clear to me that the specialty pharmacy service (as opposed to the drugs purchased by patients) is itself reimbursable, thereby making the attenuation issue that concerned the District Court all the more acute. And Guilfoile's complaint does nothing to supply useful clarification.[19]
Finally, we should, in my view, be wary of extending Bay State in construing the AKS to reach the conduct alleged here. Congress passed the AKS to address a form of corruption that threatens to cheat federal taxpayers and that might also pose a risk to public health. See, e.g., Medicare-Medicaid Anti-Fraud and Abuse Amendments, Pub. L. 95-142, 91 Stat. 1183 (1977) (describing the act as one "to strengthen the capability of the Government to detect, prosecute, and punish fraudulent activities under the [M]edicare and [M]edicaid programs"); United States v. Hancock, 604 F.2d 999, 1001 (7th Cir. 1979) (identifying the "evils Congress sought to prevent by enacting the kickback statutes" to include the "potential for increased costs to the Medicare-Medicaid system and misapplication of federal funds"). In fact, Congress was so concerned about this form of corruption that it even made it a felony to engage in the conduct that the AKS covers. See Pub. L. 95-142 (upgrading an AKS violation to a felony).
But, the AKS, like any statute that addresses an important public problem, does not have limitless reach. And, as with any statute that imposes criminal liability, as the AKS does, we must be careful to construe its reach in a manner that ensures that it affords those subject to it with due notice and in accordance with the principle that only Congress may impose criminal liability. See Liparota v. United States, 471 U.S. 419, 427, 105 S.Ct. 2084, 85 L.Ed.2d 434 (1985).
*199 I recognize that we would not need to worry about transgressing those interpretive principles here if, as the majority concludes, this case concerns the alleged reporting of conduct that falls within the AKS's "heartland." See Maj. Op. 192-93. But, I do not see how we could so conclude, no matter how broad the AKS may seem to be. In fact, if the conduct alleged in the complaint before us constitutes conduct that is of a kind that falls within the AKS's heartland, then I would be hard-pressed to conjure the kind of conduct that would reside on its outskirts.
Of course, statutes that have cores also have peripheries. And conduct that falls within the periphery of a statute's scope is no less unlawful than conduct that falls within its core. At the same time, conduct that lies outside even the periphery -- as measured, most clearly, by the words that Congress chose to denominate the statute's bounds -- is not conduct that may give rise to liability. And that is so no matter how much such conduct may seem to be concerning in its own right and no matter how much that kind of conduct may even bear some resemblance to the kind of conduct that plainly does falls within the statute's scope.
For all of these reasons, then, Bay State does not, in my view, dictate the outcome in this case. And that matters because, although we are generally free to affirm a judgment below on any ground manifest in the record, see MacDonald v. Town of Eastham, 745 F.3d 8, 11 (1st Cir. 2014), we are not equally free to reverse one on a ground that the appellant does not raise on appeal. Yet while Guilfoile did cite Bay State in a footnote in his filings below to support the proposition that "paying inducements for referrals to access markets in order to bill federal health care programs is a cognizable violation of the AKS, and therefore the FCA," he has inexplicably, as the Integrated Entity points out, abandoned that market access argument on appeal.[20] See Igartúa v. United States, 626 F.3d 592, 603 (1st Cir. 2010) (noting that "[a]rguments that are intentionally relinquished or abandoned" or "raised in a perfunctory or not serious manner [are] waived").
Having abandoned that theory for why the attenuation inherent in the conduct that he alleged poses no concern, Guilfoile engages with the attenuation issue on appeal only by invoking cases that discuss whether the plaintiff has sufficiently made out a false claim under the FCA. See, e.g., U.S. ex rel. Hutcheson v. Blackstone Med., Inc., 647 F.3d 377, 383 (1st Cir. 2011) (holding that hospitals' claims for reimbursement of doctor's services using medical devices were "false" under the FCA where the doctors had accepted kickbacks from the medical device manufacturer); United States ex rel. Yesudian v. Howard Univ., 153 F.3d 731, 740 (D.C. Cir. 1998) (holding that plaintiff had "a good faith basis for going forward at the time of retaliation" as to the "[ ]submission of a false claim to the federal government" element where the plaintiff knew that 80% of the defendant's money came from the federal government). But, those cases bear only on the separate element of an FCA
*200 action that a "false or fraudulent claim" be submitted to the federal government. See 31 U.S.C. §§ 3729(a)(1), (b)(2). Given that Guilfoile's FCA retaliation claim is premised only on the theory that the conduct that he reported to his employer was prohibited by the AKS, see 42 U.S.C. § 1320a-7b(g), that separate issue takes on significance only if Guilfoile has sufficiently alleged as a threshold matter that the conduct that he was reporting was of a kind that violates the AKS.
III.
Because I do not believe that Bay State is controlling on the critical issue of attenuation, and because Guilfoile has dropped the market access theory that he pressed below, I see no viable basis on appeal for rejecting the District Court's conclusion that Guilfoile "has not set forth sufficient factual allegations to support a plausible anti-kickback statute violation." To excuse the waiver here is to deprive the appellees of their judgment based on an argument that Guilfoile -- by abandoning that argument on appeal -- gave them no reason to think that they needed to confront and that, understandably, they did not. Accordingly, I see no reason to decide, without adequate briefing from the parties, the open interpretive question concerning the scope of what constitutes conduct that is of a kind the AKS encompasses on which Guilfoile's retaliation claim necessarily depends. And so, given the posture of this case -- a posture that is of Guilfoile's own making on appeal -- I conclude that we must affirm the District Court's decision.
I therefore respectfully dissent.

Contrary to the majority's suggestion that this distinction is insignificant, see Maj. Op. 192-93, it seems to me that the fact that the contracts between the Integrated Entity and the hospitals contemplate the provision of a general service that is not itself reimbursable under a federal healthcare program should give us pause. The text of the relevant AKS provision requires that the "good, facility, service, or item" at issue be one "for which payment may be made in whole or in part under a Federal health care program[.]" 42 U.S.C. § 1320a-7b(b)(2)(B). And I have found no authority -- nor does Guilfoile identify any -- that suggests that the AKS does encompass conduct predicated on the defendant's offering of middleman services of this type. See, e.g., United States v. Polin, 194 F.3d 863, 864-65 (7th Cir. 1999) (upholding convictions of a doctor and nurse who paid a pacemaker company sales representative a fee for each patient he "referred" to the company for pacemaker monitoring services); United States v. Vernon, 723 F.3d 1234, 1254-55 (11th Cir. 2013) (upholding conviction of specialty pharmacy executive who paid a patient advocate a 45% commission for each prescription that her patients filled at the pharmacy to induce the patient advocate to refer her patients to the pharmacy); United States v. Shoemaker, 746 F.3d 614 (5th Cir. 2014) (upholding conviction of nursing staffing company executive who paid a hospital's board chair $5 for each staffing hour that the hospital purchased from the nursing company to induce the chair to recommend to the hospital's COO that the hospital increase its hours from the nursing company).

I note that Guilfoile does cite Bay State on appeal, but only in support of the separate points that he adequately alleged that Greene's position as a financial advisor at the hospitals put him on sufficient footing to steer the hospital contracts to the Integrated Entity and that he does not need to show that the alleged arrangement resulted in a drain on the public fisc. Guilfoile does not, however, make any argument on appeal as to how Bay State resolves the attenuation issue in his favor. See González v. Vélez, 864 F.3d 45, 56 n.7 (1st Cir. 2017) ("On appeal, ... claims are deemed abandoned unless they are, at a minimum, accompanied by some developed argumentation.").