**UNITED STATES of America, Appellee,**

v.

**Mohammad Hassan HAMMOUDE,
Appellant.**

No. 91–3081.

United States Court of Appeals,
District of Columbia Circuit.

Argued Jan. 6, 1995.

Decided March 17, 1995.

Certiorari Denied June 5, 1995.
See 115 S.Ct. 2290.

Sandra G. Roland, Asst. Federal Public Defender, argued the cause, for appellant. With her on the briefs was A.J. Kramer, Federal Public Defender.

Lilly Ann Sanchez, Asst. U.S. Atty., argued the cause, for appellee. With her on the brief were Eric H. Holder, Jr., U.S. Atty., Roy W. McLeese, III, John R. Fisher and Craig S. Iscoe, Asst. U.S. Attys.

Before: BUCKLEY, RANDOLPH, and TATEL, Circuit Judges.

Opinion of the Court filed by Circuit Judge TATEL.

TATEL, Circuit Judge:

Mohammad Hassan Hammoude was arrested after purchasing several custom-made rubber stamps that could be used to make copies of United States nonimmigrant visas. Officers of the Immigration and Naturalization Service, who arrested him, also confiscated a piece of paper on which was smeared an image of the stamps. On the basis of this and other evidence presented at trial, a jury convicted Hammoude of two counts of violating 18 U.S.C. § 1028(a)(5), which bars the possession of instruments that can be used to make false "identification documents," and on two counts of violating 18 U.S.C. § 1546(a), which criminalizes various forms of fraud in connection with the reproduction of visas. We reverse Hammoude's convictions under section 1028, holding that a visa is not an identification document, and also reverse one of the section 1546(a) convictions because no reasonable juror could conclude that Hammoude had created a "counterfeit" visa. We sustain Hammoude's conviction on the second section 1546(a) count because the admission of certain evidence—his only point of appeal applicable to that conviction—was not plain error.

## I.

The heart of Hammoude's appeal is a challenge to the sufficiency of the evidence introduced at trial, and we thus consider that evidence in the light most favorable to the government. *United States v. Teffera*, 985 F.2d 1082, 1085 (D.C.Cir.1993). So understood, the evidence tells us the following.

On January 12, 1990, Hammoude and his father entered the Baumgarten Company, a vendor of rubber stamps in Washington, D.C. Hammoude asked the company's owner, Melvin "Buddy" Gusdorf, if Gusdorf could make a stamp that would reproduce a nonimmigrant United States visa. As a sample, Hammoude showed Gusdorf a Jordanian passport that belonged to his sister-in-law, directing his attention to a nonimmigrant visa printed inside.

The visa, issued by the United States consulate in Kuwait, is a multicolored image made of seven horizontal bands of different colored ink, beginning at the top in blue and then alternating red, blue, and green to the bottom. We reproduce the visa, though not in color, in Appendix A. It has a serial number at the top, followed by a United States seal, the words "United States of America nonimmigrant visa issued at Kuwait," and the date of issue. At the bottom of the visa is the signature of the consular officer, surrounded by a simple filigree. In the middle of the visa, printed in green, are spaces the consulate fills in when issuing the visa. Handwritten in the visa Hammoude showed Gusdorf were the "B2" (tourist) classification of the visa, an expiration date, and the name of Hammoude's sister-in-law, to whom the visa had been issued. Other than the name, none of the information on the visa—including the serial number—was necessarily unique to the person to whom it was issued.

Gusdorf concluded that the best way to reproduce the visa would be to make seven different stamps, one for each differently-colored strip of the visa. These stamps could

then be inked with different colors, and the impressions aligned on a piece of paper to create the multicolored copy. Hammoude approved this approach, but requested that Gusdorf omit from the rubber stamps the original visa's handwritten features, date of issue, and serial number. He ordered a separate number stamp to supply new serial numbers, and also ordered a date stamp, which he asked Gusdorf to rearrange to conform to the "day, month, year" form of the date on the visa. On the order form, Hammoude gave his name as "Abbas Ayood," and provided a false address and phone number. Gusdorf kept the passport to use as a master for the stamps.

Unfortunately for Hammoude, Gusdorf was a past chair of his trade association's Fraudulent Marking Device Committee. Gusdorf's company had also worked for federal agencies on several occasions, so he knew that Hammoude could not reproduce visas without official authorization. Gusdorf contacted the Immigration and Naturalization Service, which instructed him to fill Hammoude's order and assigned investigators to the case.

On January 19th, Hammoude returned to Gusdorf's shop to pick up the stamps. According to Gusdorf, he and Hammoude attempted to create a finished copy of a visa by aligning the images from the seven inked stamps. Gusdorf guessed that they completed two or three full impressions, although he was not certain, and the impressions were not recovered. Although somewhat frustrated with the difficulty of aligning the images, Hammoude left the store with the stamps, colored ink pads, and date and number stamps. Gusdorf was unable to contact the I.N.S. agent staking out the store when Hammoude left, so the agent could not positively identify him as the suspect. Although the agent did question Hammoude briefly as he left the store—apparently Hammoude matched Gusdorf's original description enough to raise suspicions—the agent allowed him to leave.

Hammoude's brush with the law did not deter him. Later that day, still frustrated with his inability to align the seven stamps, Hammoude called Gusdorf and asked him to make a single stamp of the entire visa. Gusdorf agreed, and told him to return in three days.

On January 22nd, Hammoude returned to the store to pick up the new stamp. He had the old stamps with him, but they were in a curious form: In an attempt to align the images, Hammoude had pulled the raised plastic piece off each stamp's wooden base and arranged them, with glue, onto a piece of paper. The result was a single "composite" stamp which was an approximation—albeit a poor one—of the one-piece visa stamp that Hammoude was picking up that day. We provide a photograph of this composite stamp in Appendix B. To carry this somewhat inky composite stamp, Hammoude had folded the backing paper over it, leaving a faint image of the stamp on the paper, which we reproduce to the right of the stamp at Appendix B.

As Hammoude left the store this time, an I.N.S. agent arrested him, confiscating the new stamp, the ink pads, the date and number stamp, the composite stamp, and the impression it had left on the paper to which it was glued. Gusdorf also gave the I.N.S. a photocopy of the visa that he had made as part of the production process.

Hammoude was indicted on four counts: two violations of 18 U.S.C. § 1028, which criminalizes the possession of false identification documents or instruments used to make them; and two violations of 18 U.S.C. § 1546(a), which bars various forms of fraud with respect to immigration papers. At trial, the government introduced the stamps as well as testimony indicating that they could be used to create imperfect but passable counterfeit visas. In defense, Hammoude claimed that he only wanted the stamps to print sample visas in a pamphlet that he was creating for Arabic visitors to the United States. He testified that he did not give Gusdorf his real name because overseas organizations could trace him and kill him "because they can call me a puppet, since I have [become an] American citizen." He also claimed that he glued the seven stamps to the paper in order to render them "useless" after discovering that their production might have been illegal.

A jury returned guilty verdicts under all four counts. Hammoude was sentenced to four months in prison, four months of house arrest, three months' supervised release, and $200 in fines. He has already served the prison term. The district court suspended the house arrest pending this appeal.

## II.

■ Hammoude was charged with two violations of section 1028 because he allegedly possessed "a document-making implement"—rubber stamps—"with the intent such document-making implement will be used in the production of a false identification document." 18 U.S.C. § 1028(a)(5) (1988). Hammoude's primary argument on appeal is that a visa is not an "identification document" as defined under the statute and, thus, that there was insufficient evidence to convict him of violating 18 U.S.C. § 1028(a)(5). We review his convictions *de novo* to determine "whether, viewing the evidence in the light most favorable to the government, '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Teffera*, 985 F.2d at 1085 (quoting *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979)).

■ We must first address the government's assertion, presented only in a footnote, that Hammoude has waived this statutory argument by failing clearly to raise it in either of his motions for a judgment of acquittal—one at the close of the government's case, and one at the close of the trial. We disagree. Hammoude's second motion for acquittal was broadly stated, without specific grounds, and was therefore sufficient to preserve the full range of challenges, whether stated or unstated, to the sufficiency of the evidence. *See United States v. Milton*, 8 F.3d 39, 45 (D.C.Cir.1993), *cert. denied*, —— U.S. ——, 115 S.Ct. 299, 130 L.Ed.2d 212 (1994). Moreover, the heart of Hammoude's appeal is that, under any conceivable interpretation of the facts, he could not have violated section 1028. Whether his appeal is framed as a due process claim, a failure to award a judgment of acquittal, or otherwise, we must reverse the conviction if Hammoude's actions were not a violation of the statute. *See United States v. Baxley*, 982 F.2d 1265, 1268 (9th Cir.1992) (holding that argument that defendant was not "in custody" at time of escape, as required by statute, was not waived by failure to raise in motion for judgment of acquittal).

Our examination of the merits of Hammoude's appeal begins with the statutory definition of "identification document." According to section 1028(d)(1), an "identification document" is "a document made or issued by or under the authority of the United States Government ... which, when completed with information concerning a particular individual, is of a type intended or commonly accepted for the purpose of identification of individuals." The House Report accompanying what became section 1028 demonstrates that the definition includes not only "identification documents, such as driver's licenses, which are widely accepted for a variety of identification purposes," but also those "'commonly accepted' in certain circles for identification purposes, such as identification cards issued by state universities and Federal government identification cards." H.R.Rep. No. 802, 97th Cong., 2d Sess. 9 (1982), *reprinted in* 1982 U.S.C.C.A.N. 3519, 3527. The House Report also notes that identification documents "normally will include such identifying elements as an individual's name, address, date, or place of birth, physical characteristics, photograph, fingerprints, employer, or any unique number assigned to an individual by any Federal or State government entity." *Id.*

We have not found, nor have the parties cited, any reported decisions involving the application of section 1028 to visas. In fact, only two published circuit court decisions, both by the Fourth Circuit, have applied the definition of "identification documents" under section 1028, and they involved Social Security cards and Form I–94 Arrival–Departure Records, which the courts concluded were "identification documents" within the meaning of the statute. *See United States v. Pahlavani*, 802 F.2d 1505 (4th Cir.1986) (I–94 forms); *United States v. Quinteros*, 769 F.2d 968 (4th Cir.1985) (Social Security cards). In the *Quinteros* case, the court

relied on testimony that Social Security cards were "commonly accepted" as identification documents. An employee of the Social Security Administration testified that the Administration often issued cards for older persons to use as identification for cashing checks. She also testified that because the cards were so often used for identification, the government removed a notice from the back of the cards that had stated that they were "Not for Identification Purposes." In all, the court concluded, there was a "common understanding that Social Security cards are identification documents." 769 F.2d at 970.

In *Pahlavani*, the court found a similar "common understanding" that immigration papers known as Form I–94 Arrival–Departure Records were identification documents, noting that they were regularly used to identify an immigrant seeking employment or public benefits. The court emphasized that the papers bore an individual's name, passport number, U.S. and foreign addresses, date of birth, and other information—the very type of information, according to the legislative history, that is contained in an "identification document" as defined under the statute. 802 F.2d at 1506 (citing H.R.Rep. No. 802, 97th Cong., 2d Sess. 9 (1982)); *see also* 769 F.2d at 970.

In contrast to the Fourth Circuit cases, the government in this case provided no evidence reasonably sufficient to persuade anyone that a visa is "intended or commonly accepted" as an identification document. We cannot comprehend the bare assertion in the government's brief that "a visa provides equivalent if not more identification information than a Social Security card." At least a Social Security card associates the bearer with a "unique number"; a visa associates an individual's name with no unique information.

The little evidence that the government presented on this point does not support its argument that a visa is an identification document within the meaning of section 1028. John Caulfield, Jr., Deputy Director of Fraud Prevention Programs at the State Department, testified that "[a] visa is a docu-ment which identifies someone as eligible to come to the United States." When asked by the government whether it was "fair to say that the visa itself identifies the passport bearer as a party that has been issued that visa," Caulfield answered, "Yes, right. It identifies the bearer of the passport as eligible to travel to the United States." None of this testimony, however, establishes that a visa is "intended or commonly accepted" as identification—i.e., that it actually assures or is intended to assure one who examines it that the bearer is the same individual as the person it "identifies." Caulfield's "yes" answer proves the unremarkable assertion that if a person has a visa in a passport, a visa has been issued to that person. And the qualification to his answer merely reinforces the fact that the only "identification" function of a visa is to "identify" someone as eligible to enter the United States—not to identify the bearer as him- or herself.

We are not persuaded by the government's argument that a visa is an identification document within the meaning of the statute because it "identifies" an individual for a certain purpose. Under this theory, any document issued by any governmental body that served any purpose specific to the individual could be considered an "identification document," including tax documents, notices of jury duty, and unemployment checks. Absent more explicit language from Congress, we read the statute to cover only those documents that are "intended or commonly accepted" for the identification of individuals as themselves, and decline to expand its meaning to cover documents that merely identify individuals as eligible for some benefit or subject to some liability.

The government relies on the legislative history to argue that since visas are used by customs officials in their "certain circle," they are "identification documents." *See* H.R.Rep. No. 802, 97th Cong., 2d Sess. 9 (1982). But as we note above, the government presented no evidence—and we do not see how it could have—that customs officials use a visa to identify an individual. A visa is not designed to assure a customs officer or

anyone else that the bearer of the visa is the individual it names. Even customs officials must look to the passport, with its name, address, photograph, and other identifying information, to verify that the bearer is the individual he or she claims to be.

Finally, the government presented evidence of a black market for visas, and claims that, as in *Pahlavani* and *Quinteros,* the presence of a black market supports its argument that they are intrinsically valuable as identification. *See* 802 F.2d at 1506; 769 F.2d at 970. The *Pahlavani* and *Quinteros* courts, however, concluded that presence of a black market merely reinforced their conclusions that the documents at issue were "identification documents." The existence of a black market means no more than that a visa has value, and adds nothing to our inquiry.

We hold that no reasonable jury could conclude that a nonimmigrant visa is an identification document as defined by 18 U.S.C. § 1028(d)(1). We thus reverse Hammoude's convictions under the first and second counts of the indictment, which charged him with a violation of section 1028.

## III.

■ Hammoude next challenges the sufficiency of the evidence convicting him on the third count for violating 18 U.S.C. § 1546(a) (1988), which includes at least two different theories of criminal liability. In the first paragraph, the statute provides for a "counterfeit" theory, establishing penalties for anyone who "knowingly forges, counterfeits, alters, or falsely makes any ... nonimmigrant visa." The second paragraph provides, in part, for an "impression" theory of liability for anyone who, without authorization, "knowingly ... makes any ... impression in the likeness of any ... nonimmigrant visa." The third and fourth counts of the indictment used both the counterfeit and impression language in charging Hammoude with violating the statute on or about January 19th and 22nd, respectively.

In defending the convictions, the government points out that Hammoude made many "impressions" of visas; at the very least, the rubber stamps might be considered impressions, as might the photocopies Gusdorf made in preparing those stamps. The government also argues that the faint smear on the folded-over paper is an impression. These multiple impressions on multiple days were more than sufficient, the government argues, to convict Hammoude under both counts of the indictment on an "impression" theory. This is certainly true with respect to count four, which the government pursued at trial on the sole theory that Hammoude had created an impression of a visa. Indeed, the verdict form for count four specifically asked the jury whether Hammoude had made unauthorized impressions. Recognizing the weight of evidence supporting this theory of liability, Hammoude does not challenge the sufficiency of evidence on this fourth count.

If the verdict form had stated a similar theory for the third count, or even if it had asked the jury whether Hammoude violated section 1546(a) generally—that is, if Hammoude was guilty of the third count as stated in the indictment—we might agree with the government and uphold the conviction on an impression theory. But that is not what happened. At trial and in the verdict forms, the government pursued the third count solely on the counterfeit theory. Indeed, at the close of the trial, although Hammoude's attorney requested that the jury verdict form simply restate the language of the indictment, the prosecutor asked that the jury be presented with much more specific questions. In particular, the government expressly stated that although both the impression and the counterfeit theories were possible under the third count, it was "only charging [the counterfeit offense] and not both," and did not want to confuse the jury by presenting it with general language, or even language outlining both theories. The trial court sided with the government, and the jury verdict form on the third count read as follows:

## Count Three

[A.]  As to Count Three, knowingly counterfeiting or falsely making a nonimmigrant visa by use of a multiple-piece rubber stamp within the premises of the Baumgarten Company of Washington, how do you find the defendant?

———— Guilty          ———— Not Guilty

[B.]  As to Count Three, knowingly counterfeiting or falsely making a nonimmigrant visa by use of a multiple-piece rubber stamp glued to a piece of paper, how do you find the defendant?

———— Guilty          ———— Not Guilty

---

The jury marked "Not Guilty" for the first question and "Guilty" for the second. The court gave it no opportunity to find Hammoude "guilty" of a violation under 1546(a) on any theory other than the counterfeit theory presented in the jury verdict form. Absent such an opportunity, we cannot, as the government argues, presume that the jury relied on an alternative "impression" theory of liability when it checked the "guilty" box in the second question. By giving the jury a special verdict only, the government tied its—and our—hands. We therefore review Hammoude's conviction on the third count only to determine whether any reasonable juror could have concluded that Hammoude was guilty, beyond a reasonable doubt, of "counterfeiting or falsely making a nonimmigrant visa by use of a multiple-piece rubber stamp glued to a piece of paper."

To pass as a counterfeit, an image must bear such a likeness to the original as "is calculated to deceive an honest, sensible and unsuspecting person of ordinary observation and care dealing with a person supposed to be upright and honest." *United States v. Gomes,* 969 F.2d 1290, 1293 (1st Cir.1992) (citation and quotation marks omitted). Hammoude argues, and the government does not really contest, that, using this standard, no evidence exists to prove that he created a counterfeit "by use of a multiple-piece rubber stamp glued to a piece of paper." The image of the composite stamp on the folded-over paper, reproduced at Appendix B, is far too smeared and faint for any individual to think it an actual visa. This is especially true since it is not printed in a passport, which, as the government's witness testified, is necessary for a valid visa in all but a few instances.

Even if the impression of the composite stamp had transferred perfectly, it would have been far from a counterfeit. Each of the individual stamps had a thin rubber border along its edge, making it impossible for Hammoude to press the stamps or their images close enough together to create a good replica of a visa. An image from the composite stamp would have been nearly half an inch larger than the real visa and would have had six gaps interrupting the text and lines of the image wherever the color changed. In addition, no image before the jury contained other identifying features—such as a date of issuance, serial number, or the handwritten notations regarding the name, expiration date, and classification—necessary to a valid visa. *See Gomes,* 969 F.2d 1290, 1294–95 (holding that blank social security cards are not counterfeits since they had no identifying features printed onto them).

For all these reasons, the composite stamp did not create—and could not have created—a sufficiently exact replica to have been a "counterfeit." Because the jury verdict form effectively prevented the jury from finding Hammoude guilty on any alternative set of facts, we reverse Hammoude's conviction under the third count.

## IV.

Because we have reversed his conviction on the first three counts, Hammoude's final point of appeal relates only to the fourth count—his conviction for making an impression of a visa in violation of section 1546(a). He argues that the trial court committed plain error by admitting a letter from his brother to a Kuwaiti colleague of his brother's, which included a postscript stating that if the colleague wanted a visa, he should send a "copy of his passport and photographs" to

Hammoude's brother. The government's use of this letter, Hammoude claims, was an impermissible attempt to prove guilt by association. It was also prejudicial, he claims, because it discredited his testimony regarding his intent to use the stamps only to produce sample visas in a tourist pamphlet.

Because Hammoude did not object to the admission of the letter at trial, we review the district court's decision to admit it for plain error. We reverse only if the admission of the letter was clear error under established law of the circuit and significant enough to prejudice the jury. *See United States v. Olano,* — U.S. —, —, 113 S.Ct. 1770, 1777, 123 L.Ed.2d 508 (1993); *United States v. Mitchell,* 996 F.2d 419, 422 (D.C.Cir.1993). The Supreme Court has warned that we should reverse a conviction only if the error "seriously affect[ed] the fairness, integrity or public reputation of judicial proceedings." *See Olano,* — U.S. at —, 113 S.Ct. at 1779 (citation and quotation marks omitted).

We need not address the question of clear error because we find that Hammoude has not proven that he was prejudiced by the admission of the letter, let alone that it "seriously affected" the fairness of the proceedings. Overwhelming evidence, such as the order forms for the stamps, the photocopy that Gusdorf made at Hammoude's direction, and the stamps themselves, supports the jury's verdict that Hammoude created an "impression" of a visa in violation of section 1546(a). Even if the jury had ignored the letter and believed Hammoude's defense, he still would have reproduced a visa without authorization, and still would have violated the statute. The admission of the letter into evidence was thus not plain error.

## V.

Because a visa is not an identification document, and because the composite stamp could not have created an image of sufficient precision to be a counterfeit, we reverse Hammoude's convictions on the first three counts and remand for resentencing. The admission of the letter was not plain error, so we sustain Hammoude's 1546(a) conviction under the fourth count of creating an unauthorized impression of a visa.

*So ordered.*