In the

# United States Court of Appeals

## For the Seventh Circuit

No. 17-1714

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

JENETTE GEORGE, also known as JIYE,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:12-cr-00559-7 — **Sara L. Ellis**, *Judge*.

ARGUED DECEMBER 5, 2017 — DECIDED AUGUST 14, 2018

Before WOOD, *Chief Judge*, and ROVNER and HAMILTON,
*Circuit Judges*.

ROVNER, *Circuit Judge*. The defendant Jenette George was
charged along with three co-defendants in an indictment al-
leging violations related to a Medicare-fraud scheme. The
indictment alleged a scheme whereby George received pay-
ments from Rosner Home Health Care, Inc. ("Rosner"), for
each Medicare patient that she referred to it. George was
tried on two counts of receiving kickbacks for Medicare re-

ferrals on April 12, 2012, and May 17, 2012, in violation of 42 U.S.C. § 1320a-7b(b)(1)(A) of the Anti-Kickback Statute, and with conspiracy to offer kickbacks beginning on or about November 2010 to July 2012, in violation of 18 U.S.C. § 371 and 42 U.S.C. § 1320a-7b(b)(2)(A). Two owners and an employee of Rosner—Ana Tolentino, Frederick Magsino, and Edgardo "Gary" Hernal—were also indicted on charges of conspiracy and pled guilty prior to trial.

The district court found her guilty on the conspiracy count and the counts alleging specific violations of the Anti-Kickback Statute Act after a bench trial, and also denied the subsequent motion seeking a judgment of acquittal or a new trial. The court sentenced George to six months of imprisonment with the substitution of imprisonment day for day at the Salvation Army Community Confinement Center in Chicago, Illinois. George now appeals her conviction to this court, arguing that there was insufficient evidence to support the conviction, that the court erred in failing to limit the cross-examination of George to matters within her knowledge as a layperson, and that the court erred in failing to designate Gary Hernal as a missing witness.

The following facts were found by the court after a bench trial, and set forth in its Memorandum Opinion and Order at the conclusion of the trial. Dist. Ct. Mem. Op. and Order of 3-22-16 at 2–6. George worked for a home health-care agency from around 2007, and in 2010 started her own referral agency the Ttenej Senior Referral Agency, which appears to be a variant of her first name, Jenette, spelled backwards. George expressed an interest to Gary Hernal, who worked for Rosner Home Health Care, Inc., in providing marketing referrals for Rosner. Hernal and George signed a

"Work for Hire Agreement" on November 17, 2010. That agreement provided that Ttenej would organize and prepare health fairs and visit doctors, hospital case managers, discharge planners, or social workers and convince them to refer patients to Rosner. The agreement provided for payment to George in an amount equal to services rendered, and specified that she would provide an independent referral service and would not be an employee of Rosner. At one point in March 2011, George sent an email to Hernal indicating that she was concerned that their arrangement might not be within the law, but George maintained that Hernal assured her at the time that the payments were allowed.

George began referring patients to Rosner and the evidence at trial, including George's own admission, established that she was paid $500 for each person referred to Rosner who was subsequently certified for admission. Hernal began cooperating in an investigation of Rosner, and the government obtained evidence including recordings made in the course of that investigation, establishing those referrals and the payments made to George—in cash or check—on a per person basis. In a conversation with Hernal on July 13, 2012, Hernal and George discussed George's preference as to payments. Hernal asked her why she preferred payments by check, but George indicated that her referrals could be all in cash. Hernal and George then discussed the legality of the payments:

> Hernal informed Defendant that two home health agencies were "busted for exactly what we're doing here, you know, getting paid for, for patients." Defendant responded, "Right." Hernal informed Defendant that paying her

> per patient was illegal and told her to be care-
> ful. Defendant asked Hernal, "Okay, careful
> how?" Defendant asked if she could be put on
> payroll, but Hernal said that she could not be-
> cause she is a contractor. Defendant said that
> was sending "mixed signals" because it was il-
> legal for her to be paid for doing referrals but
> for other services people are paid from the
> agency. Hernal again reiterated that being paid
> per patient is illegal. Defendant responded,
> "As long as it's just between the two parties, it
> shouldn't be no [*sic*] problem."

(citations omitted) Dist. Ct. Mem. Op. and Order of 3-22-16
at 4.

When George was questioned upon her arrest, she initial-
ly stated that she received biweekly payments from Rosner
in the amount of $1,000, and that those payments were only
made by check. She further stated that the payments were
not for per-patient referrals and that she knew it was illegal
to be paid per patient for referrals to home health agencies.
After the agent showed George the recordings that had been
made, George acknowledged that she had lied and that she
was paid $500, both by check and in cash, per patient that
enrolled at Rosner. She admitted that when she began re-
ceiving payments in cash sometime around November 2011,
she realized that it was illegal to be paid per patient. Bank
records of cash and checks deposited in George's bank ac-
counts, as well as referral logs, corroborated those state-
ments.

George first argues that insufficient evidence supported
the convictions. In considering a challenge to the sufficiency

of the evidence, we examine the evidence "'in the light most favorable to the government, drawing all reasonable inferences in the government's favor.'" *United States v. Patel*, 778 F.3d 607, 619 (7th Cir. 2015), quoting *United States v. Lee*, 558 F.3d 638, 641 (7th Cir. 2009). We will uphold the conviction unless, after thus viewing the evidence in favor of the government, no rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Id.*; *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). The factual findings by the district court are sufficient to support the convictions in this case.

Under the Anti-Kickback Statute, the government had to demonstrate that George knowingly and willfully solicited or received any remuneration in return for referring an individual to Rosner to provide services or arrange services, and that those services may be paid at least in part under Medicare. See 42 U.S.C. § 1320a-7b(b)(1)(A). George argues that the government failed to present sufficient evidence as to the conspiracy count as well as the individual substantive counts under that Anti-Kickback Statute.

As to the conspiracy conviction, George argues that regardless of the legality of her referrals, the government failed to introduce sufficient evidence that she joined the Rosner conspiracy. Citing two of our cases relating to drug conspiracy charges, *United States v. Townsend*, 924 F.2d 1385, 1394 (7th Cir. 1991) and *United States v. Pulgar*, 789 F.3d 807, 811–12 (7th Cir. 2015), she analogizes her actions with respect to Rosner as similar to the buyer-seller relationship in drug deals which we have found insufficient to constitute a conspiracy. She maintains that her "marketing activities" failed to place her within the general conspiracy alleged as

she lacked any stake in the benefits which were billed to Medicare.

"Proof of conspiracy may come from direct evidence or circumstantial evidence, *United States v. Hightower*, 96 F.3d 211, 214 (7th Cir.1996), as well as 'the reasonable inferences ... concerning the parties' relationships, their overt acts, and their overall conduct,' *United States v. Miller*, 405 F.3d 551, 555 (7th Cir.2005) (quoting *United States v. Navarrete*, 125 F.3d 559, 562 (7th Cir.1997))." *United States v. Lomax*, 816 F.3d 468, 474 (7th Cir. 2016) (citations in original). A jury could properly conclude that the direct and circumstantial evidence in this case established beyond a reasonable doubt that George was a participant in the Rosner conspiracy. George had a written agreement with Rosner, she provided referrals to Rosner on an ongoing basis, she was paid on a per-patient basis for those referrals, and her ability to obtain payments for those referrals was dependent on the success of the overall scheme. George did not get paid unless the persons that she referred were admitted or readmitted to Rosner. She had a stake in the success of the scheme because the continuation of her business depended on it. The district court properly held that there was sufficient evidence to support the conspiracy conviction.

George also asserts that there was insufficient evidence to support the convictions for violating the Anti-Kickback Statute. As to those convictions, she asserts that she cannot be held liable because the statute applies only to "relevant decisionmakers" or persons in a position to influence the decisions, and she was not in that position. She also contends that she did not act knowingly and willfully, and that she had a reasonable basis to believe that she fell within the safe

harbor provision of the statute. George points to evidence that could cast doubt on the elements of the offense. In order to succeed on her claims of insufficiency of the evidence, however, George must do more than merely demonstrate that evidence could have supported a finding of innocence; she must demonstrate that evidence could not have allowed a reasonable trier of fact to find her guilty. *Jackson*, 443 U.S. at 319; *Patel*, 778 F.3d at 619.

George argues that the government failed to prove that she fell within the terms of the statute. The statute provides in relevant part:

> **(b) Illegal remunerations**
>
> **(1)** whoever knowingly and willfully solicits or receives any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind—
>
> **(A)** in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, …
>
> shall be guilty of a felony … .

42 U.S.C.A. § 1320a-7b(b)(1)(A). George's conduct falls within the plain language of that provision. The evidence demonstrated that she received remuneration for referring individuals to Rosner for the provision of home health services that would be covered under Medicare.

George, however, argues that the statute is limited in its application to persons who are the "relevant decisionmak-

ers" or who are at least persons in a similar position as the relevant decisionmaker. She asserts that she did not fall within that definition because the persons she referred had to be certified by a physician before they could be admitted to Rosner, and that she did not attempt to influence the doctors who certified the patients she referred. She relies for that argument on the Fifth Circuit's decision in *United States v. Miles*, 360 F.3d 472 (5th Cir. 2004), in which the court held that payments to a marketing firm which distributed advertisement brochures of the home health service provider to physicians did not fall within the statute because they were not payments made to the relevant decisionmaker as a kickback for sending patients to the service provider.

The Fifth Circuit in a subsequent case, however, explicitly rejected a reading of *Miles* which would limit criminal liability to persons who could be deemed "relevant decisionmakers:"

> The district court … read *United States v. Miles*, 360 F.3d 472 (5th Cir. 2004), to limit drastically the meaning of "any person," such that liability cannot attach unless the "person" who receives remuneration is a "relevant decisionmaker" with formal authority to effect the desired referral or recommendation. … But as explained below, *Miles* imposed no such limitation on the meaning of "any person" and is wholly inapplicable to this case. … , *Miles* drew a distinction not between types of *payees*—"relevant decisionmakers" and others—but between a *payer's* intent to induce "referrals," which is ille-

> gal, and the intent to compensate advertisers, which is permissible.

*United States v. Shoemaker*, 746 F.3d 614, 627–28 (5th Cir. 2014). The court held in *Shoemaker* that intent, and specifically whether the evidence demonstrated an intent to induce referrals, was the focus of the inquiry in *Miles*, and that such a focus accords with Congress' concerns in the statute with imposing liability on operatives who "leverage fluid, informal power and influence." *Id*. at 629–30. Therefore, *Miles* cannot be read in the manner that George suggests, and in fact George's conduct falls squarely within the statute as interpreted by those cases in that her conduct represented an intent to induce referrals to Rosner.

Our case law is consistent with that interpretation of the statute as well. For instance, in *United States v. Polin*, 194 F.3d 863 (7th Cir. 1999), we upheld a conviction in a factually analogous case in which payments were made to a pacemaker sales representative for each Medicare patient that he referred to the Center for Vascular Studies for pacemaker monitoring services. The defendants were the ones who paid the pacemaker representative, and they argued that the representative could not make a referral under the statute because only a physician is capable of making a referral, reasoning that the physician's—not the sales representative's—permission was needed for services. *Id*. at 865. We held that the conduct in that case was a classic case of an illegal kickback under the statute. *Id*. at 867. Although in *Polin* the defendants were the ones paying for the referral rather than making the referral and therefore convicted under subsection (b)(2)(A) rather than (b)(1)(A) of § 1320a-7b, there is no basis whatsoever for defining the term "referral" differently

in the two sub-provisions. As in *Polin*, payments were made in this case to refer a Medicare patient to a service provider, and such conduct is prohibited under the plain language of the statute. See also *Patel*, 778 F.3d at 618 (holding that the concept of "referring" under the statute is broad and includes conduct in which the defendant directed a person to a particular provider or even where a physician through recertification allowed a patient to receive care from that provider and was paid in return for those efforts). The district court did not err in determining that the actions in this case fell within the statute.

George also asserts that there was insufficient evidence that she acted knowingly and willfully under the statute, but this claim cannot withstand scrutiny. Her own words are sufficient to demonstrate that she acted knowingly or willfully. In her interview upon her arrest, George first stated that she received only biweekly payments of $1,000 from Rosner—made only by check—and that the payments were not per-patient. She admitted that she knew that it was illegal to be paid per patient for referrals to home health agencies. When confronted with the tape recordings demonstrating that her characterization of the payments was a lie, she acknowledged that she had lied and that she was paid $500, both by check and in cash, per patient that she referred who was admitted at Rosner. She had acknowledged that she received cash payments at least as of November 2011—at other times indicating it began as early as March 2011—and admitted that, when she began receiving payments in cash, she realized that it was illegal to be paid per patient. That is sufficient evidence to establish that she acted knowingly and willfully in accepting the two payments on April 12, 2012, and May 17, 2012. Her initial efforts to hide the nature and

manner of the payments would alone constitute such evidence, but here we also have her outright admission that she realized the payments were illegal when she began receiving cash, and the cash payments began at a time period before the payments that are the basis for the two substantive charges here.

Although that evidence alone would be enough, other evidence corroborates those incriminating statements, including bank records of cash and checks deposited in George's bank accounts, as well as referral logs. In addition, that evidence as to her knowledge and willfulness was further bolstered by other testimony, including testimony as to a book she claimed to have read in early 2011 called the *Ultimate Guide to Home Health Marketing* which explained the illegality of referral payments.

George brings a separate challenge as to the government's questioning of her regarding this book, arguing that the district court erred in allowing the government to question her as to whether she had read certain paragraphs in the book, but that argument is without merit. First, George admitted the book into evidence in her direct examination, and testified that in early 2011 after reading the book she developed concerns about how she and Rosner were doing business and sent an email to Hernal expressing her concerns. She acknowledged reading enough of the book to have concerns about the legality of her arrangement with Rosner, but denied reading sections that specifically discussed kickbacks. The government on cross-examination first questioned her as to the first page of the first chapter of that book, which was an article entitled "Marketing Within the Four Corners of the Law" and quite clearly stated that it was

unlawful to receive payment for referrals of patients to such providers. That was a legitimate area of cross-examination given that George had testified that she read parts of the book that caused her to question the legality of the payments, and given the location and subject matter of that paragraph in the book. The subsequent questioning was also limited to parts of the book that a person would be likely to read if seeking information as to the legality of the arrangement. The district court did not abuse its discretion in allowing cross-examination as to the book that George herself raised in her direct examination and which she introduced into evidence.

George's only other challenge to cross-examination is her claim that the government improperly sought a legal opinion from her, a layperson, when it questioned her as to her knowledge of the illegality of referral payments. George has no authority for the proposition that a defendant cannot be asked about her own knowledge or state of mind—a question which she is uniquely positioned to answer—and which seeks factual information not a conclusion as to its legal significance.

Accordingly, the district court properly determined that sufficient evidence supported all of the elements of the offense under the Anti-Kickback Statute, and did not err in its decision as to cross-examination. George nevertheless contends that she established a good faith belief that the safe harbor provisions of the statute applied.

Once the government establishes the elements of a violation of the Anti-Kickback Statute, the burden shifts to a defendant to demonstrate by a preponderance of the evidence that her conduct fell within the safe harbor provision of the

statute. *United States v. Jumah*, 493 F.3d 868, 873 (7th Cir. 2007); *United States v. Vernon*, 723 F.3d 1234, 1269–71 (11th Cir. 2013). George argues that two safe harbor provisions are applicable. The first provides in relevant part that the Anti-Kickback Statute does not apply as to payments made between "a health center entity described under clause (i) or (ii) of section 1396d(l)(2)(B) of this title" and any individual or entity providing services to that health center pursuant to an agreement if that agreement contributes to the ability of the health center to "maintain or increase the availability, or enhance the quality, of services provided to a medically underserved population served by the health center entity." 42 U.S.C. § 1320a-7b(b)(3)(I). The provision applies only to Federally-qualified health centers as defined in clauses (i) or (ii) of 42 U.S.C. § 1396d(l)(2)(B), and George presented no evidence at trial that Rosner was a health center that fell within that definition. She therefore has failed to meet her burden to demonstrate that applicability of that safe harbor provision.

The only other safe harbor provision she asserts applies only to "any amount paid by an employer to an employee (who has a bona fide employment relationship with such employer) for employment in the provision of covered items or services." 42 U.S.C. § 1320a-7b(b)(3)(B). George points to her written agreement with Rosner, but that agreement specifies that George is acting as an independent referral agency with respect to employment and not an employee. Moreover, George admitted that she was not an employee and that she was an independent contractor. In addition, as the district court pointed out, George was paid for referrals and not for the provision of items or services covered by Medicare, as required for that safe harbor provision to apply. The dis-

trict court properly held that George did not establish that her conduct fell within the safe harbor provisions of the statute.

George's final contention is that Hernal should have been considered a "missing witness" because he was not called by the government. She argues that the district court erred in failing to accept her proposed missing witness instruction, which would have allowed the court to infer from Hernal's absence that Hernal would have provided information unfavorable to the government's case. See *United States v. Tavarez*, 626 F.3d 902, 904 (7th Cir. 2010). The missing witness instruction is disfavored in our circuit but may be given in unusual circumstances. *Id*.; *United States v, Wright*, 722 F.3d 1064, 1068 (7th Cir. 2013). A defendant seeking such an instruction must show: "(1) that if called the witness would have been able to provide relevant, noncumulative testimony on an issue in the case; and (2) that the witness was peculiarly in the other party's power to produce." *Tavarez*, 626 F.3d at 904–05; *Wright*, 722 F.3d at 1068–69. "A witness is peculiarly within a party's power to produce if she either (1) is physically available to only that party; or (2) has such a relationship with one party as to effectively make her unavailable to the opposing party, regardless of actual physical availability." *Tavarez*, 626 F.3d at 905. The second form of unavailability thus encompasses both physical unavailability and what has been termed "pragmatic unavailability." *United States v. Villegas*, 655 F.3d 662, 670 (7th Cir. 2011). George argues that Hernal was unavailable because he cooperated with the government in his case when he pled to the conspiracy charge and the government dropped the obstruction of justice enhancement. But George does not argue that Hernal has an interest in the outcome of her case or otherwise

was unavailable from a pragmatic standpoint. Hernal was sentenced to 9 months' imprisonment on January 29, 2015, well before George's trial in October 2015, and George makes no argument that Hernal's sentence could be impacted by George's outcome. George relies instead on the evidence that Hernal cooperated with the government, but "a witness's status as a confidential informant does not necessarily give rise to a sufficient relationship with the government so as to render [him] unavailable to the defense." *Tavarez*, 626 F.3d at 905; *Villegas*, 655 F.3d at 670. Moreover, the testimony that she claims Hernal would have provided at best would have corroborated her claim that in March 2011 he told her that the arrangement was legal. But George acknowledged that once she began receiving cash payments, in at least November 2011, she was aware that the referrals were unlawful, and therefore by her own admission she was aware of the illegality when she accepted the payments in 2012. Accordingly, even if the missing witness instruction had been appropriate, its omission here would have been harmless error.

The judgment of the district court is AFFIRMED.