In the

# United States Court of Appeals

## For the Seventh Circuit

_____

No. 24-1557

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

MARK SORENSEN,

*Defendant-Appellant.*

_____

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:19-cr-00745-1 — **Franklin U. Valderrama,** *Judge.*

_____

ARGUED DECEMBER 4, 2024 — DECIDED APRIL 14, 2025

_____

Before HAMILTON, JACKSON-AKIWUMI, and PRYOR, *Circuit Judges*.

HAMILTON, *Circuit Judge*. This appeal tests some of the outer boundaries of the federal Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b), which prohibits payments in return for referrals of patients for medical care that will be reimbursed under the federal Medicare or Medicaid programs. The Anti-Kickback Statute applies, for example, if a hospital or drug manufacturer pays a physician for referring a patient to the

hospital or for prescribing the manufacturer's drug. The government seeks to extend the statute in this case to treat as federal crimes the defendant's payments to advertising and marketing companies that worked with a manufacturer to sell orthopedic braces for Medicare patients. A jury found defendant-appellant Mark Sorensen guilty of one count of conspiracy and three counts of offering and paying kickbacks in return for referral of Medicare beneficiaries to his company, SyMed Inc. The district court denied his motion for judgment of acquittal.

We reverse for insufficient evidence. The other individuals and businesses Sorensen paid were advertisers and a manufacturer. They were neither physicians in a position to refer their patients nor other decisionmakers in positions to "leverage fluid, informal power and influence" over healthcare decisions. *United States v. George*, 900 F.3d 405, 411 (7th Cir. 2018), quoting *United States v. Shoemaker*, 746 F.3d 614, 630 (5th Cir. 2014). Sorensen's payments thus were not made for "referring" patients within the meaning of the statute. Because we reverse for insufficient evidence, we do not address Sorensen's challenges to the district court's jury instructions or evidentiary rulings.

I.   *Factual and Procedural History*

Sorensen owned and operated SyMed Inc., a Medicare-registered distributor of durable medical equipment. In January 2015, Sorensen met with Bernard Perconti, the owner and operator of PakMed LLC, which was a durable medical equipment manufacturer; Christina Anderson, the head of Byte Success Marketing; and Dianne Chancellor of Dynamic Medical Management, a billing agency. Together, they agreed on a plan to advertise orthopedic braces to patients, to obtain

signed prescriptions from the patients' doctors, to distribute the braces, and then to collect reimbursement from the federal Medicare program.

The business model had several steps. First, Byte and another marketing firm called KPN published advertisements for orthopedic braces. Interested patients responded via electronic forms providing their names, addresses, and doctors' contact information. This information was forwarded to call centers where a Byte or KPN sales agent would contact the patient to discuss ordering a brace and generating a prescription form. After collecting additional information, and with consent from patients to proceed, the sales agents faxed the prefilled but unsigned prescription forms to patients' physicians. Byte's prescription forms contained SyMed's name and corporate logo and listed the devices to be ordered.

Critical to our decision, the physicians who received these unsigned prescription forms then decided whether to sign and return the forms to SyMed and Dynamic for review—or to ignore them. Physicians declined 80 percent of the orders sent by KPN and regularly ignored forms sent by Byte.[1] If a physician signed and approved a prescription, Sorensen's company SyMed directed PakMed to ship the braces to patients while Dynamic billed Medicare on behalf of SyMed. SyMed then paid PakMed 79 percent of funds collected from Medicare or other insurance, kept 21 percent as a service fee,

---

[1] The record does not specify more clearly the proportion of physicians who failed to return Byte's prescriptions. At trial, Perconti testified that "the doctor would either return or not return the prescription signed," and that Byte often made "multiple attempts to get a prescription back" from a doctor.

and out of that 21 percent also paid Dynamic for its role in billing. Out of its 79 percent share, PakMed paid the advertising firms, KPN and Byte, based on the number of leads that each generated.[2]

A federal grand jury indicted Sorensen on four counts. Count One charged Sorensen with conspiring to offer and pay remuneration, including kickbacks and bribes, for furnishing services for which payment may be made in whole or in part under a federal health care program in violation of 42 U.S.C. § 1320a-7b(b)(2)(A), known more commonly as the Anti-Kickback Statute. Counts Two, Three, and Four charged Sorensen with substantive violations of the Anti-Kickback Statute on three specific payments.

The case was tried to a jury. At the close of the government's case, Sorensen moved for acquittal under Federal Rule of Criminal Procedure 29(a). The district court reserved judgment on his motion. The jury then found Sorensen guilty on all counts. Sorensen again moved for acquittal as well as for a new trial on all counts under Federal Rules of Criminal Procedure 29(c) and 33. In his Rule 29 motion, Sorensen argued that the government did not prove his guilt beyond reasonable doubt because it did not establish his awareness of the scheme's illegality. He also argued that conspiracy was unproven because there was no evidence that any of the alleged co-conspirators were aware of the supposed illegality of their agreement as of January 2015. The district court denied Sorensen's post-trial motions.

---

[2] KPN generated most of the business. Over the course of the arrangement, SyMed—through PakMed—paid $11.6 million to KPN and only $1.8 million to Byte.

Characterizing the question as a "close call," the court found that the evidence regarding willfulness allowed the jury to find beyond a reasonable doubt that Sorensen "knew from the beginning of the agreement in 2015 that the percentage fee structure and purchase of the doctor's [sic] orders violated the law." The district court sentenced Sorensen to 42 months in prison but released him on bond pending appeal.

II. *Analysis*

A. *Standard of Review*

We review de novo a district court's denial of a motion for a judgment of acquittal. *United States v. Polin*, 194 F.3d 863, 865–66 (7th Cir. 1999). "[P]ractically speaking, however, the standard of review is that for sufficiency of the evidence." *United States v. Peterson*, 823 F.3d 1113, 1120 (7th Cir. 2016). "In a sufficiency-of-the-evidence challenge after a jury verdict, we review the evidence presented at trial in the light most favorable to the government and draw all reasonable inferences in its favor." *United States v. Anderson*, 988 F.3d 420, 424 (7th Cir. 2021). "We will overturn a conviction only if, after reviewing the record in this light, we determine that no rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt." *Id.* We have sometimes described this hurdle as "nearly insurmountable," but only "nearly," not "completely." *Id.*, quoting *United States v. Faulkner*, 884 F.3d 488, 492 (7th Cir. 2018); accord, *United States v. Garcia*, 919 F.3d 489, 496–97 (7th Cir. 2019) ("[T]he height of the hurdle depends directly on the strength of the government's evidence." (quoting *United States v. Jones*, 713 F.3d 336, 339 (7th Cir. 2013)).

The government contends that plain-error review applies on the theory that Sorensen is relying on new arguments on appeal. We disagree. Sorensen has refined his arguments on appeal, but both of his Rule 29 motions before the district court included a general challenge to the sufficiency of the evidence. His Rule 29(a) motion argued broadly that the government's evidence was "insufficient to sustain a conviction on the charge of conspiracy to pay and receive bribes and kickbacks, as charged in Count One, and offering and paying bribes and kickbacks, as charged in Counts Two through Four." Dkt. 196 at 2. Similarly, his Rule 29(c) motion argued broadly that "there was insufficient evidence to support the jury's guilty verdict" on all counts, and that motion included more specific arguments, as well. Dkt. 200 at 2. The arguments Sorensen raises on appeal are within the scope of his broad arguments in the written motions and his oral arguments in the district court. In the district court, he asserted that advertising medical supplies or related products is "completely lawful." Dkt. 211 at 1243. He also argued that obtaining authorization to contact a patient's physician regarding a potential prescription for medical care is both "lawful and appropriate." Dkt. 211 at 1243.

Precedent teaches that when an accused defendant moves for judgment of acquittal and raises specific arguments, any omitted arguments are forfeited and subject to only plain-error review on appeal. E.g., *United States v. Hosseini*, 679 F.3d 544, 550 (7th Cir. 2012). We have also recognized, though, that a general Rule 29 motion preserves *all* sufficiency arguments

for appeal. E.g., *United States v. Maez*, 960 F.3d 949, 959 (7th Cir. 2020).[3]

This approach to forfeiture creates an unusual incentive for defendants to present vague arguments to the district court in Rule 29 motions. See *United States v. Kieffer*, 991 F.3d 630, 637–41 (5th Cir. 2021) (Oldham, J., concurring) (observing that allowing a general Rule 29 motion to preserve all sufficiency arguments "encourages defendants to say as little as possible in the district court and to save their good arguments as 'gotchas!' for appeal"). We have expressed skepticism about this approach because of the perverse incentives it creates. See *United States v. Rivers*, 108 F.4th 973, 978 n.1 (7th Cir. 2024) (acknowledging that "the perverse incentives" created by forfeiture rule "dissuade defendants from making specific arguments in a Rule 29 motion").

In any event, though, Sorensen did not forfeit his appellate arguments in the district court. He filed one broad Rule 29 motion challenging the sufficiency of the evidence and another, more specific Rule 29 motion. In such cases, our colleagues in other circuits have allowed the broad motion to preserve for appeal specific arguments not raised in the more narrowly focused motion. See, e.g., *United States v. Facteau*, 89 F.4th 1, 39 n.26 (1st Cir. 2023) (applying de novo review to specific Rule 29(c) motion because defendant's earlier Rule 29(a) motion asserted a general challenge to the sufficiency the evidence and adequately preserved the issue for appeal);

---

[3] In *Maez* we wrote: "A motion under Rule 29 that makes specific arguments waives issues not presented, but a general motion preserves every objection," 960 F.3d at 959, though it would be more precise to say that other specific issues are forfeited rather than waived.

*United States v. Hammoude*, 51 F.3d 288, 291 (D.C. Cir. 1995) (second, broader Rule 29 motion was stated broadly and preserved full range of challenges to sufficiency of evidence); see also *United States v. Marston*, 694 F.3d 131, 135 (1st Cir. 2012) (noting good reason to treat an ambiguous Rule 29 motion as "general" in the sense that it preserves all grounds and thus avoids creating "a trap for the unwary defense lawyer").

Here, Sorensen's Rule 29(a) motion presented a general challenge to the sufficiency of the evidence. His later Rule 29(c) motion refined that broad challenge but also preserved it. Under the reasoning of *Facteau* and *Hammoude*, the more specific motion thus did not forfeit specific arguments not raised. Sorensen's arguments in support of his Rule 29 motions were also consistent with those he advances on appeal to show that the advertising scheme did not violate the statute as a matter of law. Taken together, Sorensen's motions and his arguments in support of those motions preserved the arguments he makes on appeal. We therefore apply de novo review, giving the government and the jury verdict the benefit of conflicting evidence and reasonable inferences that could be drawn from it.[4]

---

[4] To the extent that a fear of sandbagging animates Rule 29 forfeiture jurisprudence, there is no cause for concern here. In the district court, Sorensen provided ample notice to the government of his view that his conduct did not fall under the Anti-Kickback Statute as a matter of law. The government was not blindsided by the arguments on appeal. In addition, the district court considered both motions, and the arguments we find persuasive on appeal were within the scope of the Sorensen's broad motion and implicit in his more specific challenges to evidence of criminal intent in the district court.

B.  *The Anti-Kickback Statute*

Turning to the essential elements of the offense, the Anti-Kickback Statute provides in relevant part:

> (2) Whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person–
>
>> (A) to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program … shall be guilty of a felony….

42 U.S.C. § 1320a-7b(b)(2)(A).

The Anti-Kickback Statute primarily targets payments to individuals with influence over or access to patients that lets them control or influence the patients' choices about medical care. The typical example is a physician who accepts money in exchange for sending patients to a particular healthcare provider such as a hospital or a specialist. See, e.g., *United States v. Nagelvoort*, 856 F.3d 1117, 1120 (7th Cir. 2017) (affirming convictions where hospital paid physicians for referrals); *United States v. Patel*, 778 F.3d 607, 608–09 (7th Cir. 2015) (affirming convictions where physician received payments for signing orders authorizing home health services); *United States v. Borrasi*, 639 F.3d 774, 776 (7th Cir. 2011) (affirming conviction where hospital paid physician for Medicare patient referrals).

The statute can reach non-physicians, as well, although such cases seem to be much less common among those prosecuted. See, e.g., *George*, 900 F.3d at 409–10, 414 (affirming conviction of home healthcare referral agency employee); see also *Polin*, 194 F.3d at 866–67 (affirming conviction for payments to sales representative for pacemakers whose recommendations for outside monitoring services had never been overruled by physicians: "The different subsections [of the Anti-Kickback Statute] do not distinguish between physicians and lay-persons.").[5]

C. *Inducing Referrals*

For a payment to fall within the prohibitions of 42 U.S.C. § 1320a-7b(b)(2)(A), a payor must act with the intent to induce referrals from the payee. See *George*, 900 F.3d at 411 (defendant's conduct fell "squarely within the statute … in that her conduct represented an intent to induce referrals" to home healthcare provider). Our "focus on intent, not titles or formal authority" is consistent with "Congress's concerns in enacting the statute—to broaden liability to reach operatives who leverage fluid, informal power and influence." *Shoemaker*, 746 F.3d at 629–30. Nevertheless, a payee's position

---

[5] One unusual feature of this case is that if Sorensen, Perconti, and the advertisers had all worked for the same company, their actions apparently would not be viewed as federal crimes. To align incentives, employers regularly structure compensation based on how much business employees generate. The Anti-Kickback Statute recognizes this common practice. Among its exclusions, for example, the statute contains a safe harbor provision, 42 U.S.C. § 1320a-7b(b)(3)(B), that exempts payments by "an employer to an employee (who has a bona fide employment relationship with such employer) for employment in the provision of covered items or services…."

can be relevant in determining the purpose of a payment. See *Patel*, 778 F.3d at 615 (discussing physician's particular incentive to authorize unnecessary care if receiving referral payments); see also *United States v. Marchetti*, 96 F.4th 818, 826 (5th Cir. 2024) ("[A]s between payment to a rancher and a doctor, it is dramatically easier to infer intent improperly to induce medical referrals from the doctor.").

Physicians have significant power to guide patients to specific providers and to approve care. They sign prescriptions and authorize specialized treatments. See *Patel*, 778 F.3d at 616 (describing physician's unique role as "gatekeeper to federally-reimbursed care"). As a result, a payor's intent to induce a referral when offering to pay a physician can be clear, at least when the physician is providing no other benefit to the payor.

Our inquiry here, however, involves payments to non-physicians. In these less common cases, we consider whether a payee "leverage[s] fluid, informal power and influence" over healthcare decisions. *George*, 900 F.3d at 411 (affirming convictions of non-physician payee), quoting *Shoemaker*, 746 F.3d at 630. A payee's formal authority to authorize Medicare-covered services is not necessary to violate the statute. See *George*, 900 F.3d at 411–12 (affirming convictions and rejecting argument that defendant did not fall under statute because "the persons she referred [also] had to be certified by a physician before they could be admitted"); see also *Polin*, 194 F.3d at 866 (rejecting reading of statute that would criminalize payments to physicians who selected pacemaker monitoring service providers but not payments to pacemaker salesperson who influenced and effectively controlled physicians' choices). We find nothing in *George* or *Polin*, however, that

would extend their reach to payments for aggressive advertising efforts, as distinct from payments to individuals who take advantage of their existing relationships with patients or other health care providers, which was the case in both *George* and *Polin*.

In this case, there simply is no evidence that the entities Sorensen paid—PakMed, KPN, and Byte—leveraged any sort of informal power and influence over healthcare decisions. Sorensen's payments to these entities therefore did not violate the Anti-Kickback Statute. KPN and Byte provided only advertising services. PakMed actually manufactured and distributed the braces that were ultimately sold and reimbursed through Medicare. It did not refer any patient to another healthcare provider.

Before this case, we have not had occasion to consider the Anti-Kickback Statute's application to advertising activities. We find guidance in several Fifth Circuit decisions, starting with *United States v. Miles*, 360 F.3d 472 (5th Cir. 2004). In *Miles*, the Fifth Circuit overturned convictions under the Anti-Kickback Statute where a Medicare-registered home healthcare provider paid a public relations firm. Citing our decision in *Polin*, the Fifth Circuit explained that there are "certain situations where payments to non-doctors would fall within the scope of the statute," but the court distinguished between a payment to induce referrals from a payee who is in a position to make or influence healthcare decisions, which violates the statute, and a payment for advertising services, which does not. *Miles*, 360 F.3d at 480–81, citing *Polin*, 194 F.3d at 864–65.

The Fifth Circuit distinguished the public relations firm in *Miles* from the sales representative in *Polin*—whose

recommendations on pacemaker monitoring services "had never been overruled by a physician during his fourteen year career." *Polin*, 194 F.3d at 865. The Fifth Circuit held that payments to the public relations firm were not illegal kickbacks. In *Polin*, the sales representative's "judgment was shown to have been improperly influenced by the payments he received" because he was the decisionmaker—evidenced by the fact that his choices of service providers had never been overruled in fourteen years. See *Miles*, 360 F.3d at 481. In *Miles*, by contrast, the public relations firm "supplied promotional materials" to physicians and occasionally "plates of cookies to doctors' offices." *Id.* at 479–80. These influences did not prevent physicians from deciding independently whether to authorize care and which provider to choose for their patients. *Id.* at 480–81.

The facts here resemble *Miles* much more closely than *Polin*. In *Miles* there "was no evidence that [the advertiser] had any authority to act on behalf of a physician …." *Id.* at 480. Similarly, here the government has produced no evidence that Sorensen, PakMed, KPN, or Byte authorized medical care. Nor did they "unduly influence the doctors' decisions." *Id.* at 480. With patients' consent, KPN and Byte faxed unsigned prescriptions—containing patient information and the specified device to be ordered—to physicians. The physicians retained full discretion to determine whether to prescribe the advertised care. In many cases, physicians decided not to do so. As the government acknowledges, 80 percent of the blank prescriptions sent by KPN and many sent by Byte simply were not returned.

This is a far cry from *Polin*, where the physicians' approval "seemed to be more of a formality or rubber stamping" of the

sales representative's referral. 194 F.3d at 866. Unlike *Polin*, KPN and Byte's communications to physicians are best understood as proposals for care, not as referrals. And to the extent they might be deemed "recommendations" to physicians, they were frequently overruled. Sorensen's scheme also differs from the one held illegal in *George*. 900 F.3d at 411. There, the defendant's conduct fell "squarely within the statute" because she leveraged her existing relationships with and informal power and influence over doctors to direct Medicare patients to a specific home healthcare provider in exchange for cash payments. *Id.* at 408–11. Here, in contrast, the marketers did not—and indeed were not even positioned to—exert such influence over the doctors prescribing care.

The key point is that, on this record, physicians always had ultimate control over their patients' healthcare choices and applied independent judgment in exercising that control. Nobody is accused here of paying any kickbacks to any physicians.[6] As for PakMed, its role was to manufacture and ship the braces. It never directly contacted patients or physicians. The fact that SyMed shared revenue with PakMed on a percentage basis does not render the arrangement illegal. "[P]ercentage-based compensation structures are not per se unlawful." *Marchetti*, 96 F.4th at 831. Instead, to violate the

---

[6] During oral argument we asked whether it should affect our analysis if 100 percent of doctors instead of only 20 percent had signed the proposed prescriptions they received. We are not adopting any bright-line rule. Our focus is on whether a payee exerts informal but substantial influence so that a physician's choice of care becomes a formality rather than an exercise of independent medical judgment. That was the case in *Polin* but not here.

statute, "the payments have to be made in order to induce an unlawful referral," which "requires proof beyond showing that a percentage-based compensation contract existed." *Id.*

We also take guidance from the Fifth Circuit's 2024 decision in *Marchetti*, which affirmed Marchetti's conviction for receiving illegal kickbacks on a narrow basis but determined that most of his actions had not violated the Anti-Kickback Statute. 96 F.4th at 824. The government's case focused on Vantari Genetics LLC, a medical laboratory that specialized in pharmacogenetic testing. Vantari paid Marchetti, owner of a sales and marketing company, a percentage of revenue that the Vantari laboratory received from each Medicare patient whom Marchetti attracted to the laboratory with his advertising and marketing. *Id.* at 821–22. Although the government introduced evidence showing that Marchetti was compensated for these supposed "referrals" and that he and Vantari obfuscated the structure of these payments, it failed to offer any evidence that Marchetti exercised any impermissible influence on "those who make healthcare decisions on behalf of patients." *Id.* at 827. The closest the government came to "providing the missing link [was] its assertion that Marchetti had 'relationships with, access to, and influence over' doctors." *Id.* But clearly "not every sort of influence is improper." *Id.* After all, the purpose of advertising is to influence decision making: "What are advertisers hired to do anyway?" *Id.*

Marchetti's conviction was ultimately affirmed, however, based on his later work for two competing laboratories. In those roles, Marchetti decided which of the competing laboratories received patient samples. He also "motivated Vantari to align its swab-related protocols with [the

competing laboratory's] to streamline the process of servicing both." 96 F.4th at 827. In short, a rational trier of fact could have found that by choosing between the two competing laboratories, Marchetti himself had become a "relevant decision maker," and payments made to him were intended to induce his referrals. *Id.* Marchetti's conduct in that role was "much more like the hypothetical that *Miles* explicitly said would constitute an [Anti-Kickback Statute] violation: Medical service provider pays salesman, salesman makes choice about service provider, salesman is never overruled." *Id.* Note that the hypothetical discussed there referred to the facts in our decision in *Polin*, where we affirmed the conviction.

As in *Marchetti*, the central question we confront here is whether Sorensen intended to "induce 'referrals,' which is illegal," or whether he intended to "compensate advertisers, which is permissible." 96 F.4th at 825, quoting *Shoemaker*, 746 F.3d at 628. *Marchetti* illustrates why Sorensen's payments were legal compensation for advertisers. The court held much of Marchetti's conduct lawful because the prosecution did not show that Marchetti had any special relationship with or influence over the relevant decisionmakers—specifically, the doctors responsible for selecting laboratories for patient sample testing. *Id.* at 827. Similarly, here, there is no evidence that anyone whom Sorensen paid had any special relationship with or influence over patients' physicians so as to subject them to improper influence. As previously discussed, the sales agents whom Sorensen paid had received consent from patients before faxing unsigned prescriptions to their physicians for review. Those physicians were not rubber stamps but more often than not decided not to authorize the requested care.

Because no evidence suggests that Sorensen or his associates exerted any sort of special informal influence on the physicians making healthcare decisions, his conduct did not violate the Anti-Kickback Statute. Cf. *Shoemaker*, 746 F.3d at 626–29 (reversing judgment of acquittal where nurse staffing business paid hospital executive in exchange for pressuring hospital to hire staffing company's nurses and pay invoices on time; staffing company paid the executive "to exploit his personal access" to contracting authorities at the hospital); *United States v. Vernon*, 723 F.3d 1234, 1254–56 (11th Cir. 2013) (affirming conviction of patient advocate who referred patients to specialty pharmacy in exchange for payment; patients "did not even know which pharmacy filled their prescriptions because they gave control" of pharmacy selection to patient advocate); *Guilfoile v. Shields*, 913 F.3d 178, 192–93 (1st Cir. 2019) (scheme where payee with power to steer hospital contracts accepts payment in exchange for referring clients to payor "is in the heartland of what the [Anti-Kickback Statute] is intended to prevent….").

Finally, the government relies on Sorensen's July 2019 interview with federal law enforcement agents to show his consciousness of wrongdoing. During the interview, Sorensen appeared to acknowledge that paying for doctors' orders or compensating marketing firms on a percentage basis may be illegal. He also denied engaging in either practice. The interview does not save the convictions. Sorensen did not pay for doctors' orders. Instead, he paid KPN and Byte to find interested patients and paid PakMed to manufacture and distribute braces. Sorensen recognized that the government might question the contractual arrangements, but his statements in the interview simply did

not show that he was paying anyone for patient referrals within the scope of the statute.

Physicians and non-physicians alike may exert formal or informal influence on patients' choice of healthcare providers, taking advantage of their existing relationships to reduce competition and harm patients at the expense of Medicare and the taxpayers who pay for it. The text of the Anti-Kickback Statute and sound public policy support punishing payments to induce such influence. Here, however, Sorensen's payments to PakMed, KPN, and Byte were made in exchange for ordinary and legal services—advertising, manufacturing, and shipping products—not for referrals. We express no view on the general social value of aggressive and even pesky advertising campaigns like Sorensen's, which may cause unnecessary expenditures on medical devices or other forms of health care. But aggressive advertising efforts are not equivalent to unlawful referrals of patients. Because there was no evidence that would allow a reasonable jury to find beyond a reasonable doubt that Sorensen paid or agreed to pay anyone for referring patients within the meaning of the Anti-Kickback Statute, the district court's judgment is REVERSED.